| AUSA: | Philip Ross | Telephone: (313) 226-9790 |
|---|---|---|
| Special Agent: | Stephen Osterling, FBI | Telephone: (313) 965-5379 |

AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
## Eastern District of Michigan

| | |
|---|---|
| United States of America | |
| v. | |
| **SANGITA PATEL, M.D.** | Case No.  Case: 2:23−mj−30053<br>Assigned To : Unassigned<br>Assign. Date : 2/3/2023<br>USA V. SEALED MATTER (CMP)(CMC) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ 7/1/2020 through 6/30/2022 _____ in the county of _____ OAKLAND _____ in the
_____ EASTERN _____ District of _____ MICHIGAN _____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § § 1347, 1349 | Conspiracy to Commit Health Care Fraud |

This criminal complaint is based on these facts:

SEE AFFIDAVIT.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent STEPHEN OSTERLING, FBI
_____
*Printed name and title*

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date: ___ February 3, 2023 ___

City and state:  Detroit, Michigan

_____
*Judge's signature*

Hon. Kimberly G. Altman, United States Magistrate Judge
_____
*Printed name and title*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**

I, Stephen T. Osterling, being first duly sworn, hereby depose and state as follows:

1.     This Affidavit is made in support of an application for a Criminal Complaint and an arrest warrant under Federal Rules of Criminal Procedure 3 and 4

## EXECUTIVE SUMMARY

2.     Federal agents are investigating Sangita Patel, M.D. ("PATEL"), for conspiracy to distribute controlled substances and health care fraud related to her improper billing for telehealth physician visits. Medicare billing data reflects that PATEL submits or causes the improper submission of Medicare claims for telehealth visits, which fail to meet the criteria for permissible telehealth visits. For the two-year period beginning July 1, 2020, through June 30, 2022, approximately 76% of PATEL's reimbursements from Medicare were for telehealth-related claims. These payments were approximately 9 times the payments for the proceeding two-year period beginning July 1, 2018.

3.     PATEL also prescribes Schedule II controlled substances to these patients whose appointments with PATEL were telehealth visits. Over 90% of the

1

patients involved in PATEL's telehealth insurance claims received Schedule II controlled prescriptions. Approximately 70% of PATEL's prescriptions were for commonly diverted Schedule II controlled substances. To date, the investigation has established that PATEL has delegated her prescription authority to an unlicensed medical assistant, INDIVIDUAL-1 ("INDIVIDUAL-1"). Based upon cell site search warrant data and undercover visits, patients contact INDIVIDUAL-1 via cellular phone, at the direction of PATEL. INDIVIDUAL-1 subsequently enters electronic prescriptions for Schedule II controlled substances into an electronic medical records system. PATEL then signs into the system and sends the electronic prescriptions to pharmacies without any interactions with the patients.

## AFFIANT'S BACKGROUND AND QUALIFICATIONS

6.     I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since May 2010. I am currently assigned to the Detroit Field Office of the FBI. I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), in that I am empowered by law to conduct investigations and to make arrests for federal felony offenses. As part of my duties, I investigate crimes related to health care fraud.

7.     Over approximately the last twelve years, my primary responsibility has been the investigation of criminal fraud, with the last six years more specifically focused on fraud against the federally funded health care programs commonly

known as Medicare and Medicaid. These investigations have included individuals, organizations, and businesses that have violated federal laws, including, but not limited to, Title 18, United States Code, Section 1347 (Health Care Fraud), Title 18, United States Code, Section 1349 (Conspiracy to Commit Health Care Fraud), Title 21, United States Code, Section 841(a)(1) (Distribution of Controlled Substances), and Title 21, United States Code, Section 846 (Conspiracy to Distribute Controlled Substances). In connection with investigating these offenses, I have participated in the execution of search warrants for documents and other evidence in cases involving violations of these offenses.

## <u>FACTUAL BASIS IN SUPPORT OF CRIMINAL COMPLAINT</u>

8.     Based on the facts set forth in this affidavit, there is probable cause to believe that Dr. Sangita Patel and INDIVIDUAL-1 have committed the following violations of federal law (collectively, the "Target Offenses"):

      a.  Title 18, United States Code Section 1347, Health Care Fraud;

      b.  Title 18, United States Code Section 1349, Conspiracy to Commit Health Care Fraud;

      c.  Title 21, United States Code Section 841 (a)(1), Distribution of Controlled Substances;

      d.  Title 21, United States Code Section 846, Conspiracy to Distribute Controlled Substances.

9.     The statements in this Affidavit are based upon information I learned during the investigation, including information provided to me by other law enforcement agents, and my experience and background as an FBI Special Agent. Because this affidavit is being submitted for the limited purpose of supporting a search warrant, I have not included every fact known to me concerning this investigation. I have only set forth the facts I believe are necessary to establish probable cause that SANGITA PATEL committed the Target Offenses.

## INVESTIGATION OVERVIEW

10.     In November 2021, the Federal Bureau of Investigation ("FBI") and the United States Department of Health and Human Services Office of Inspector General ("HHS-OIG") opened a joint investigation into Dr. Sangita Patel ("PATEL") and her medical practice, Advance Medical Home Physicians ("ADVANCE"). A confidential human source ("CHS-1") indicated that PATEL was accepting cash in exchange for medically unnecessary Schedule II controlled substances. CHS-1 previously pleaded guilty to one count of conspiracy to commit health care fraud in the United States District Court for the Eastern District of Michigan in February 2018. Since that time, CHS-1 has provided information to the FBI which was found to be truthful, reliable, and timely.

11.     The Michigan Automated Prescription System ("MAPS") showed that between January 1, 2019, and July 1, 2022, PATEL has issued prescriptions for

over 590,000 tablets of controlled substances. Approximately 70% of these prescriptions were for DEA Schedule II controlled substances, which are the substances the DEA has determined have the highest risk for abuse and dependence but still have a medical purpose.

12.     CHS-1 later learned PATEL would accept patients with government-funded health insurances, such as Medicare and Medicaid, in addition to patients who pay for their appointments with cash. Affiant reviewed PATEL's Medicare and Medicaid billing records. From January 1, 2018, to July 1, 2022, PATEL has billed approximately $3.4 million to Medicare. Of this, 63% resulted from "Established Patient Office or Other Outpatient Visit" billing codes, specifically CPT codes 99212-99215. These billing codes are broken down based upon complexity and/or time spent with the patient. The established times spent with the patient for these codes, when time is the determining factor, are: 99212 – 10 to 19 minutes; 99213 – 20 to 29 minutes; 99214 – 30 to 39 minutes; and 99215 – 40 to 54 minutes. As the time spent increases, so does the billing amount ranging from $90 for 99212 to $297 for 99215.

13.     Approximately 69% of PATEL's office visit billings were under code 99215 and 28% were under code 99214. Conversely, only 3% were under codes 99212 and 99213, combined. Based on Affiant's knowledge, training, and experience, it is unusual and an indication of health care fraud for a medical

provider to bill the highest complexity office visit at such a rate. Additionally, a time study was completed wherein the total expected time of all procedures billed for services rendered by PATEL each day was analyzed. This time study found that from January 1, 2018, to October 12, 2021, there were 10 days when PATEL billed for over 24 hours of services, 12 days when she billed for between 20 and 24 hours of services, and 35 days when she billed for between 16 and 20 hours of services.

14.    PATEL's Medicare billing records also reflected the use of Modifier 95 which is used for telehealth visits. This modifier was created by the American Medical Association ("AMA") in 2017 and its use became more prevalent during the COVID-19 pandemic. The Current Procedural Terminology (CPT) for Modifier 95, as developed by the AMA, titles the code as, "Synchronous Telemedicine Service Rendered via Real-Time Interactive Audio and Video Telecommunications System."  Medicare's website[1] further details that telehealth visits covered under Modifier 95 require both audio and video communications. "Medicare telehealth services are services that would normally occur in person but are instead conducted via telecommunications technology. Service such as…telephone visits are not services that would normally occur in person." Medicare billing records reflect that beginning March 16, 2020, PATEL billed

---

[1] https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/TelehealthSrvcsfctsht.pdf

Medicare for approximately $1.1 million using Modifier 95, indicating the services were conducted via telehealth. This represented approximately 70% of PATEL's total billings over that time period. During 2020 when, based on affiant's knowledge and experience, most physicians saw a decrease in insurance claim reimbursements, PATEL saw an increase. From March 16 to December 31, PATEL's reimbursements were a 2% increase from the same period in 2019 and a 20% increase from 2018.

15.    Medicaid billing data for ADVANCE showed similar activity. Between January 1, 2018, and August 5, 2022, ADVANCE billed approximately $2.1 million to Medicaid. 52% of all of ADVANCE's billings were for office visit code 99215 and an additional 23% were for office visit code 99214. Approximately $960,000 of the billings to Medicaid used modifier 95 indicating the procedures were performed via telehealth, which was nearly 79% of all billings beginning March 24, 2020.

16.    Based on Affiant's training and experience, medical providers often use documents known as "Superbills" to perform medical billing. The information contained within a Superbill varies, but at a minimum typically includes information to identify the patient, the date of service, and the procedures which were performed. The medical provider under whom the claims will be billed sometimes sign the documents. Superbills can be hardcopy documents or

electronic documents completed within an electronic medical records system. Based on text messages between INDIVIDUAL-1 and PATEL, as obtained via search warrant to Apple, ADVANCE used hardcopy Superbills. For example, on February 15, 2021, when INDIVIDUAL-1 was living in Kingston, MI, INDIVIDUAL-1 sent the following to PATEL: "My husband is going to bring superbills for you to sign after he gets off work."  INDIVIDUAL-1 also received a text message on February 6, 2021, from a phone number with a listed subscriber address of ADVANCE's office, according to records from Verizon, that indicated the superbills were the documents used by ADVANCE to bill for services rendered. That message read, "[INDIVIDUAL-1], I billed superbills from 1/4/21 to 1/11/21."

17.     In August 2022, WRS Health, an electronic medical records systems and medical billing company, provided records related to ADVANCE in response to a grand jury subpoena. Within those records were Superbills. One such document was for Patient W.M. with a date of service of February 21, 2022 (an encounter further described later in this affidavit). This Superbill, which appears to contain PATEL's signature, includes a fax header at the top of the document that indicates it was faxed from INDIVIDUAL-1's phone number to ADVANCE's fax number, as identified on ADVANCE's website.

18.     CHS-1's reporting identified INDIVIDUAL-1 as PATEL's Medical

Assistant. Phone records and CHS-1 statements corroborate that INDIVIDUAL-1,

and not PATEL, called patients for appointments where it was subsequently

determined that PATEL submitted Medicare claims using modifier-95. According

to Medicare's website[2] Medicare rules and regulations, permit "Incident To"

billing wherein services rendered by a non-physician practitioner under the direct

supervision of a physician may be billed as if rendered by the physician. Medicare

considers a non-physician practitioner to be a medical professional such as a

physician's assistant, nurse practitioner, and clinical nurse specialist. A search of

the website for the Michigan Department of Licensing and Regulatory Affairs

("LARA") located no such medical licenses for INDIVIDUAL-1.

19.     Further, Medicare's definition of direct supervision provides that the

supervising physician must be present in the office suite and immediately available

to provide assistance, though not necessarily present in the same room. During a

phone call with INDIVIDUAL-1 on February 8, 2022, CHS-1 reported hearing

children in the background. This call was made by CHS-1 on speakerphone in the

presence of Affiant, who made the same observation. Additionally, during an

office visit with PATEL at ADVANCE's office on February 14, 2022, PATEL told

CHS-1 that INDIVIDUAL-1 worked out of her home which was about two hours

---

[2] https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-
MLN/MLNMattersArticles/downloads/se0441.pdf

away from the clinic. INDIVIDUAL-1's driver's license identifies her residence as being in Kingston, Michigan. Google Maps shows the commute from INDIVIDUAL-1's residence to the clinic would take approximately one and one-half hours.

20.    Cell site information was obtained for both PATEL's and INDIVIDUAL-1's cell phones. This information showed that all of INDIVIDUAL-1's calls to CHS-1, which were made using a phone known to be associated with INDIVIDUAL-1, were made through a cell phone tower approximately 1.5 miles southwest of a residence known to be associated with INDIVIDUAL-1. At or around these same times, a cell phone known to be associated with PATEL was using a cell phone tower and sector consistent with both ADVANCE's office in Troy, Michigan – and PATEL's residence. The cell phone tower was located at 42.598036, -83.073549, which is approximately one mile from both of these locations. The only exception to that was on April 13, 2022, when PATEL's phone used a cell phone tower still in Troy but not near ADVANCE's office.

21.    Bank records for ADVANCE obtained via subpoena showed the company has also received payments from other health care providers to which PATEL has referred patients, to include a medical laboratory and a home health care agency each of which submits claims to Medicare. Since January 1, 2017,

ADVANCE has received approximately $143,000 by two providers located in Southeast Michigan. During this same time period, PATEL also referred patients to those providers which in turn billed a combined $1.3 million to Medicare for claims associated with those patients. Medicare regulations prohibit the payment of any claim related to a beneficiary induced by an illicit kickback. Title 42, United States Code, Section 1320(a)-(7b) criminalized the payment of kickbacks used to induce beneficiaries to receive treatment by federally-insured healthcare programs.

## CHS-1

22.     In December 2021, CHS-1 called the office of ADVANCE and spoke with INDIVIDUAL-1, who identified herself as PATEL's Medical Assistant. During this call, INDIVIDUAL-1 stated ADVANCE accepts Medicare and cash payments. CHS-1 scheduled an appointment with PATEL for January 2022. A few days prior to the appointment, INDIVIDUAL-1 communicated with CHS-1 about the upcoming appointment via text message using the INDIVIDUAL-1's cell phone.

23.     On or about January 10, 2022, CHS-1 had an appointment with PATEL at ADVANCE's office. CHS-1 carried a device that allowed agents from the FBI and HHS-OIG to listen to the appointment in real-time and recorded the appointment. During the appointment, CHS-1 described shoulder pain that was a 4 or 5 on a scale of 1 to 10. CHS-1 provided an MRI, which CHS-1 told PATEL was

about ten years old. CHS-1 told PATEL s/he had previously used Norco (the brand name for Hydrocodone-Acetaminophen) for the shoulder pain but could not recall the strength of the prescription. At the conclusion of the appointment, PATEL stated she would issue CHS-1 with a two-week supply of Norco, but CHS-1 first needed to contact INDIVIDUAL-1 with the strength of the prior prescription and which pharmacy CHS-1 wanted to send the prescription as ADVANCE only issued electronic prescriptions. PATEL charged CHS-1 $350 for this appointment, which CHS-1 paid in cash.

24.    According to text messages obtained by agents from Apple via search warrant, on January 10, 2022, INDIVIDUAL-1 and PATEL had the following text message exchange about CHS-1's prescription:

INDIVIDUAL-1:  Are you sending anything for [CHS-1]?

PATEL:        [S/He's] supposed to csll [sic] you with pharmacy and the norco dose [s/he] tried

INDIVIDUAL-1:  Oh [s/he] hasn't called yet

PATEL:        Call [him/her]

INDIVIDUAL-1:  There's nothing on [his/her] maps for pain meds

PATEL:        I know

PATEL:        From a while back

25.     Later that same day, INDIVIDUAL-1 sent CHS-1 a text message, a screenshot of which CHS-1 provided to the FBI. The text message read, "Hello, spoke with the doctor and she said you were supposed to give me a call regarding which pharmacy you want to go to and which dose of Norco you've had in the past?"  CHS responded the prior prescription was for Norco 7.5 milligrams and identified a pharmacy.

26.     According to the search warrant results for INDIVIDUAL-1's iCloud account, INDIVIDUAL-1 then sent this information to PATEL via text message. On January 10, 2022, INDIVIDUAL-1 wrote to PATEL, "7.5 mg and cvs [CHS-1] said".

27.     MAPS data showed that instead of a two-week supply, PATEL prescribed 240 tablets of Norco 7.5 milligrams, which was indicated as a 30-day supply. On February 8, 2022, INDIVIDUAL-1 sent PATEL a text message about this, stating "Patient [CHS-1] you sent Norco and said take every 3 hours. #240. Was that a mistake?"  PATEL responded, "Yes q3   It is three a day". There was no evidence of any further communication regarding this. The only other text messages regarding CHS-1 from that day was when INDIVIDUAL-1 said, "[CHS-1] and Campbell pain meds" to which PATEL responded, "Ok".

28.     On February 8, 2022, CHS-1 had a telephone appointment with INDIVIDUAL-1 using INDIVIDUAL-1's cell phone. CHS-1 made this call on

speakerphone in the presence of agents and also recorded the call. During the call, INDIVIDUAL-1 said, "She [referring to PATEL] made a mistake," and the prior prescription was only supposed to be for 90 tablets. CHS-1 responded s/he had been taking the medication as prescribed, which would have been eight tablets per day. INDIVIDUAL-1 asked if CHS-1 had any remaining tablets from the prior month's supply, and CHS-1 stated s/he did not. CHS-1 requested a stronger medication and INDIVIDUAL-1 stated, "I'll go up to the tens," referring to Norco 10 milligrams. At the end of the appointment, CHS-1 asked if s/he needed to speak with the doctor. INDIVIDUAL-1 responded there was no need for CHS-1 to speak with the doctor unless CHS-1 had a question. As CHS-1 did not have any questions, the appointment was ended with CHS-1 providing a credit card number to cover the cost of the appointment, which was $250. MAPS showed that PATEL issued CHS-1 a prescription for 90 tablets of Norco 10 milligrams on February 8, 2022.

29.    INDIVIDUAL-1's iCloud account showed that on the next day, PATEL directed INDIVIDUAL-1 to have CHS-1 come into the clinic to have a urine test. INDIVIDUAL-1 and PATEL had the following text message conversation:

INDIVIDUAL-1:  [CHS-1] med

PATEL:         Ok

> PATEL:        [S/He] needs to come in for urine test
>
> PATEL:        Have [him/her] come friday
>
> INDIVIDUAL-1:  Okay
>
> PATEL:        Im sending the med but [s/he] needs to come in
>
> INDIVIDUAL-1:  Okay calling [him/her]

30.    CHS-1 reported that INDIVIDUAL-1 contacted CHS-1 via text message. INDIVIDUAL-1 stated PATEL wanted CHS-1 to come to ADVANCE's office to provide a urine screen. CHS-1's appointment was scheduled for February 14, 2022. On that date, CHS-1 went to ADVANCE and recorded the appointment with PATEL. After providing the urine sample, PATEL told CHS-1 the cost of the appointment was $60 and after payment PATEL would issue CHS-1's prescription. CHS-1 had not requested and was not expecting to receive another prescription as this was less than one week after the prior prescription. After CHS-1 made payment, PATEL told CHS-1 she would send the prescription over to CHS-1's pharmacy. MAPS showed PATEL issued another 90-tablet prescription of Norco 10 milligrams on February 14, 2022.

31.    Beginning in March 2022, and continuing into July 2022, CHS-1 had telephone appointments with INDIVIDUAL-1. Each of these calls was recorded. The calls were typically about five minutes long, though the call on July 11, 2022, was only approximately two minutes. CHS-1 only spoke with INDIVIDUAL-1 and

15

has not had any interactions with PATEL since providing the urine sample on

February 14, despite there being additions and changes to the controlled substances

issued to CHS-1 under PATEL's DEA registration. For example, on March 21,

2022, Methadone was added to CHS-1's prescriptions. During CHS-1's telehealth

call with INDIVIDUAL-1 on that day, CHS-1 told INDIVIDUAL-1 that PATEL

had mentioned possibly adding Methadone. INDIVIDUAL-1 told CHS-1 she could

start CHS-1 on a prescription of five milligram Methadone twice per day. PATEL

did not speak with CHS-1 prior to issuing this prescription. Each appointment cost

$250 and afterwards prescriptions were sent to CHS-1's pharmacy.

32.    According to MAPS, the prescriptions were:

| Date | Dosage |
|------|--------|
| March 21, 2022 | 120 Norco 10 mg<br>60 Methadone 5 mg |
| April 13, 2022 | 120 Percocet 10 mg (Oxycodone-Acetaminophen)<br>60 Methadone 5 mg |
| May 16, 2022 | 120 Percocet 10 mg<br>60 Methadone 5 mg |
| June 13, 2022 | 120 Percocet 10 mg<br>60 Methadone 5 mg |
| July 11, 2022 | 120 Percocet 10 mg<br>60 Methadone 5 mg |

33.    In August 2022, WRS Health, an electronic medical records and

medical billing company, provided records related to ADVANCE. Among these

records were access and activity logs that detailed which user accessed

16

ADVANCE's electronic medical system, which patient file was accessed, what actions were performed, and the IP addresses used to access the WRS Health System. According to these logs, after the February 14, 2022, appointment, PATEL only accessed CHS-1's file to route prescriptions to CHS-1's pharmacy or to send "medication counsels."  This includes after the March 21, 2022, appointment when Methadone was added to CHS-1's prescriptions.

34.     In contrast, for the visits when PATEL saw CHS-1 in person, the logs showed actions such as "Pulls Chart," "Modifies Note," and "Adds Medication." The logs also showed INDIVIDUAL-1 performed actions such as "Starts Note," "Views Patient Health Record," and "Views EMR Note."  Based on Affiant's training and experience, these actions would have been present in the logs if PATEL had been supervising the treatment of CHS-1.

35.     Most often when INDIVIDUAL-1 accessed the WRS Health electronic medical records system, she did so using an IP address which was provided by Hughes Network Systems ("Hughes"), a satellite internet service provider. For example, during the February 8, 2022, encounter, INDIVIDUAL-1 used IP address 184.53.0.72 to document the visit. Public databases identify this IP address as being registered to Hughes.

36.     Affiant spoke with a Hughes representative who indicated that Hughes could not specifically identify a user based solely on an IP address.

However, records from Hughes, obtained via subpoena, did show that INDIVIDUAL-1 was a Hughes customer with a service address of INDIVIDUAL-1's known residence. On February 8, 2022, this account used the Hughes' network for a total of approximately 22.5 hours. INDIVIDUAL-1 also used Hughes' IP addresses to document the April 13, May 16, June 13, and July 11 visits for CHS-1. Hughes' records showed this account accessed the Hughes' network for at least 20 hours on those days.

**Patients**

**Patient K.L.**

37.    MAPS showed Patient K.L. received prescriptions for controlled substances from PATEL from October 19, 2020, through December 20, 2021. Medicare billing records for PATEL showed K.L. was a patient from September 7, 2020, through January 21, 2022. During that time, Medicare was billed for 54 office visits for K.L., all but one of which were billed at the highest two levels. Additionally, 51 of these office visits were identified as telehealth visits based on ADVANCE's use of the Modifier 95 for billing.

38.    Activity logs from WRS Health showed that INDIVIDUAL-1 documented the majority of K.L.'s visits at ADVANCE. For example, on October 19, 2020, the date of K.L.'s first prescription from PATEL, both Medicare and Medicaid were billed for code 99215 - Established patient office or other

outpatient visit, 40-54 minutes with Modifier 95. INDIVIDUAL-1 performed the majority of actions such as "Adds Medication," "Starts Note," and "Pulls Chart." Conversely, PATEL's only actions on October 19 were to delete a prescription and then route K.L.'s prescriptions to a pharmacy. There was no documentation of "Pulls Chart," "Views Patient Health Record," or other similar activity for PATEL.

39.     The toll record analysis identified a phone number ending in -7838 as belonging to K.L. Subscriber information was obtained from AT&T for this number, which confirmed K.L. was the user of this phone number. The call records from AT&T showed there were five calls between K.L. and INDIVIDUAL-1 on October 19, 2020. The total combined time of these calls was 7 minutes 33 seconds, with the longest call lasting 5 minutes 21 seconds. There were no calls with K.L. and any phone numbers known to be associated with PATEL. Toll records for INDIVIDUAL-1's phone showed there were four calls between INDIVIDUAL-1 and PATEL on this date for a total of eight seconds. Apple iCloud records showed there were seven text messages between INDIVIDUAL-1 and PATEL, none of which referred to K.L. A review of MAPS data showed that on that day, K.L. was prescribed 21 tablets of Percocet 10 milligrams and 21 tablets of Methadone 10 milligrams by PATEL.

40.     One week later, on October 26, 2020, Medicare and Medicaid were again billed for code 99215 - Established patient office or other outpatient visit,

40-54 minutes with Modifier 95 rendered to K.L. MAPS showed a prescription

was issued to K.L. by PATEL on October 27, 2020, for 90 tablets of Oxycodone

15 milligrams. Again, the activity logs from WRS Health showed INDIVIDUAL-1

documented this patient encounter. PATEL's only actions were to route K.L.'s

prescription to the pharmacy, with no activities such as "Pulls Chart" or "View

Patient Health Record."

41.     The WRS Health activity logs showed that INDIVIDUAL-1 used IP

address 184.53.0.122 to document this visit with K.L. Public databases identified

this IP address as being provided by Hughes. Records from Hughes showed that

INDIVIDUAL-1's account with Hughes accessed the Hughes network for a

combined total of approximately 24 hours.

42.     Call records from AT&T showed there were seven calls and four text

messages between K.L. and the INDIVIDUAL-1 over this two-day period (these

text messages were not contained within the search warrant results of

INDIVIDUAL-1's iCloud account). The calls lasted for a total of 3 minutes and 42

seconds. Location information for INDIVIDUAL-1's cell phone obtained from

AT&T via search warrant showed that for these calls, INDIVIDUAL-1's phone

utilized a cell tower tower located in Kingston Township, Michigan, approximately

one and one-half miles INDIVIDUAL-1's residence. Records from AT&T showed

no calls between INDIVIDUAL-1 and PATEL on either October 26 or October 27,

2020. According to the iCloud records, there were approximately 104 text messages between INDIVIDUAL-1 and PATEL during the same time period. Within those, the only discussion regarding K.L. occurred when INDIVIDUAL-1 notified PATEL that K.L.'s prescriptions had not been received by the pharmacy.

43.     Similar patterns occurred over K.L.'s duration as a patient, though some of the telehealth visits were performed using PATEL's phone, indicating PATEL performed the visit. For example, on April 23, 2021, Medicare and Medicaid were both billed for code 99214 - Established patient office or other outpatient visit, 30-39 minutes with Modifier 95. MAPS showed K.L. was issued a prescription for 120 tablets of Oxycodone 15 milligrams by PATEL on that date.

44.     Call records for K.L. provided by AT&T showed that on April 23, 2021, there were three calls with PATEL lasting a total of 9 minutes and 11 seconds. In this instance when PATEL spoke with the patient, the activity logs from WRS Health showed that PATEL was working on K.L.'s patient file in the EMR system. For instance, on that date, the following were among PATEL's actions: Pulls Chart, Starts Note, Adds Medication, and Assigns Note. These were in addition to routing the prescriptions to the pharmacy, which PATEL also performed.

45.     Between October 19, 2020, and December 20, 2021, K.L. received 29 controlled substance prescriptions for 2,742 tablets from PATEL. The biggest

portion of this was 16 prescriptions for 1,890 tablets of Oxycodone 15 milligrams.

Medicare was billed a total of $21,701 and Medicaid an additional $14,823 for

serviced rendered to K.L. Of these amounts, 78% and 91%, respectively, were for

telehealth services as identified by the use of modifier 95.

**Patient T.D.**

46.     Patient T.D., according to Medicare billing records, has been an

ADVANCE patient since November 15, 2018. During that time, there were 87

office visits billed to Medicare for T.D., 48 of which were billed using Modifier 95

and all but three were billed under the highest two levels. T.D. also had Medicaid

insurance, which was also billed by PATEL. Subscriber information and call

records were obtained for telephone number ending in -5131 from T-Mobile via

subpoena. These records reflect T. D. as the subscriber for this number.

47.     On August 31, 2020, Medicare and Medicaid were both billed for an

office visit for T.D. under code 99215 - Established patient office or other

outpatient visit, 40-54 minutes with Modifier 95. Based on the activity logs from

WRS Health, INDIVIDUAL-1 completed the documentation for this visit. Her

actions included "Pulls Chart," "Starts Note," and "Adds Medication."  According

to the activity logs from WRS, PATEL's only actions were to route T.D.'s

prescriptions to the pharmacy. MAPS showed PATEL issued T.D. a prescription

for 90 tablets of Oxycodone 10 milligrams and 90 tablets of Carisoprodol 350 milligrams, a schedule IV-controlled substance.

48.     The T-Mobile call records showed T. D. had one call with phone number (248) 250-9920, which ADVANCE's website lists as the business's office phone number. This call lasted only six seconds. Phone records also showed T.D. had four calls with INDIVIDUAL-1 at his/her residence, which lasted a total of 3 minutes and 19 seconds. Location information from AT&T showed that her cell phone used a cell tower consistent with ADVANCE's office. Toll records showed one call between INDIVIDUAL-1 and PATEL on that day which lasted five seconds.

49.     Similar patterns occurred throughout the period covered by the phone records, such as on May 10, 2022. On that day, Medicare and Medicaid were billed for an office visit for T. D. as 99215 - Established patient office or other outpatient visit, 40-54 minutes with Modifier 95. Again, the activity logs showed INDIVIDUAL-1 documented the patient encounter using IP address 184.53.0.88, which is provided by Hughes. INDIVIDUAL-1's account with Hughes at INDIVIDUAL-1's residence was active for approximately 23 hours that day. PATEL's only actions according to WRS Health records were to route the prescriptions and send "Medication Counsels."  MAPS showed PATEL issued T.

D. prescriptions for 120 tablets of Oxycodone 15 milligrams and 90 tablets of Carisoprodol 350 milligrams.

50.     The T-Mobile call records showed on May 10, 2022, T.D. had one call with the ADVANCE office line -9920 lasting 24 seconds and two calls with INDIVIDUAL-1 lasting a total of 1 minute and 17 seconds. Location information for INDIVIDUAL-1's phone indicated these calls were made using a cell tower and sector consistent with his/her residence. Around that same time, PATEL's phone used a cell tower consistent with ADVANCE's office. There was one call between INDIVIDUAL-1's and PATEL's numbers which lasted 9 minutes and 57 seconds. This call occurred approximately two and one-half hours after the calls between INDIVIDUAL-1 and T.D. and approximately five and one-half hours before the call between T.D. and the ADVANCE office phone. iCloud records showed 35 text messages between the Subject Telephones. The only reference to T.D. was when INDIVIDUAL-1 sent a text message to PATEL to let her know T.D.'s prescription was not received by the pharmacy.

51.     MAPS data showed that T.D. received 93 controlled substance prescriptions for a total of 8,221 tablets between January 11, 2019, and June 7, 2022. This primarily consisted of 4,005 tablets of Oxycodone 15 milligrams and 3,474 tablets of Carisoprodol 350 milligrams. Between November 15, 2018, and

June 7, 2022, ADVANCE billed $30,365 to Medicare and $25,824 to Medicaid.

73% and 47% of these billed amounts, respectively, were for telehealth services.

**Patient W.M.**

52.     Patient W.M., according to Medicare billing records, has been an

ADVANCE patient since at least January 2018. During that time, there were 110

office visits billed for T.D., 56 of which were billed using Modifier 95 and all but

one was billed under the highest two levels. W.M. was also a Medicaid beneficiary

and his Medicaid insurance was billed by PATEL as well.

53.     Billing records show only that Patel submitted claims to Medicare for

a telehealth visit on February 21, 2022 using code 99215 - Established patient

office or other outpatient visit, 40-54 minutes with Modifier 95. Toll records for

INDIVIDUAL-1's cell phone identified a number ending in -9894 as belonging to

W.M. Subscriber records obtained from Verizon confirmed W.M. to be the user of

the -9894 number. The Verizon records showed that on February 21, 2022, W.M.

had two calls with INDIVIDUAL-1 which lasted 8 minutes, 5 seconds. Location

information from AT&T showed INDIVIDUAL-1's cell phone used a cell tower

and sector located in Kingston Township, Michigan, consistent with his/her

residence. There were no calls between W.M. and PATEL, nor were there any calls

between INDIVIDUAL-1 and PATEL. The records from Apple showed there were

texts messages between INDIVIDUAL-1 and PATEL, but none of those messages

contained references to W.M. INDIVIDUAL-1's calls to W.M. while in Kingston,

Michigan, occurred at approximately 10:34 a.m. and 11:55 p.m. Location

information from Verizon showed that between 10:07 a.m. and 12:19 p.m.,

PATEL's phone used a cell tower and sector in Troy, Michigan, consistent with

ADVANCE'S office in Troy, Michigan, to complete four phone calls.

54.     The WRS Health Activity logs showed INDIVIDUAL-1 documented

the patient visit. PATEL's only actions for W.M. on that day were to route the

prescriptions to a pharmacy and to send "Medication Counsels."  MAPS showed

that on February 21, 2022, PATEL issued W.M. a prescription for 90 tablets of 80

milligram Oxycontin.

55.     Records show that PATEL submitted claims to both Medicare and

Medicaid were billed for telehealth visits on April 14 and 19, 2022. Both dates

were billed for code 99215 - Established patient office or other outpatient visit, 40-

54 minutes with Modifier 95. Toll records from Verizon showed that on April 14,

2022, W.M. had three calls with INDIVIDUAL-1 at his/her residence, three calls

with PATEL using her cell phone, and three calls with the ADVANCE office

phone number. These calls lasted a total of 13 minutes, 14 seconds. Location

information from AT&T indicated that INDIVIDUAL-1 used his/her cell used a

cell tower located in Shelby Township, Michigan. This area, which is

approximately 7.5 miles from ADVANCE's office, has no known association with

INDIVIDUAL-1. Location information from Verizon indicated that around the time of PATEL's calls to W.M., her cell phone used a cell tower and sector consistent with ADANCE's office location in Troy, Michigan.

56.     The WRS Health Activity logs also showed both PATEL and INDIVIDUAL-1 were active in W.M.'s patient file that day. Based on the actions that day, INDIVIDUAL-1 documented much of the encounter and PATEL modified the visit note. When INDIVIDUAL-1 accessed the patient file, she did so using an IP addresses serviced by Hughes. INDIVIDUAL-1's account with Hughes was active on the Hughes network on April 14, 2022, for approximately 20 hours.

57.     The April 19, 2022, patient visit was handled by PATEL, who was the only user to modify the patient chart according to WRS Health records. Toll records reflected that on April 19, W.M. spoke with PATEL for 1 minute, 45 seconds, and also spoke with someone using the ADVANCE office phone number for 1 minute, 4 seconds. Location information from Verizon PATEL's cell phone used a cell tower consistent with ADVANCE's office to make the call to W.M.

58.     MAPS data reflected that PATEL issued a prescription for 90 tablets of 80 milligram Oxycontin to W.M. on both April 14 and 19, 2022. The April 14 prescription was not filled until June 14, 2022, whereas the April 19 prescription was filled on April 22, 2022.

59.     W.M. was interviewed by Affiant on January 12, 2023. During the interview, W.M. stated he has in-person appointments with PATEL every few months at which he receives injections. In between those appointments, he has telehealth appointments with "[INDIVIDUAL-1]" and provided INDIVIDUAL-1's known phone number as the number used by INDIVIDUAL-1. These telehealth appointments were audio-only and W.M. estimated they lasted approximately four minutes. W.M. does not speak with PATEL during the telehealth appointments. W.M. also told agents, "It's like [PATEL] has a hold over me," and "I'm like [PATEL's] prisoner."  W.M. clarified that he was afraid he would not be able to obtain his pain medication from another doctor and he felt pressured by PATEL to receive injections and buy "tapes" which contained medical educational videos.

60.     Between January 24, 2019, and June 14, 2022, W.M. received 93 controlled substance prescriptions for a total of 8,000 tablets from PATEL. This included 4,020 tablets of 80 milligram Oxycontin and 3,915 tablets of Carisoprodol 350 milligrams. ADVANCE billed Medicare $46,695 and Medicaid $33,574 for services to W.M. between January 25, 2018, and June 14, 2022. Of these billed amounts, 76% and 41%, respectively, were for telehealth services.

**Financial Records**

61.    Records for ADVANCE, PATEL, and INDIVIDUAL-1 were

obtained from several financial institutions. Records from PNC Bank showed that

between January 1, 2017, and July 29, 2022, ADVANCE was paid approximately

$1.56 million from Medicare and $129,000 from other insurance providers, such as

Medicaid and other private payors. Additionally, ADVANCE received

approximately $258,000 in credit/debit card settlement payments and $79,000 in

cash deposits. CHS-1 used both cash and a credit/debit card to pay for

appointments with ADVANCE.

62.    TSYS, LLC, is a credit/debit card processing company. TSYS

processes credit/debit card transactions for merchants and receives payments from

financial institutions. TSYS then pays the merchants, collecting a fee in the

process. Records from TSYS showed that between January 15, 2018, and August

19, 2021, TSYS collected approximately $150,000 on behalf of ADVANCE.

Subpoenas were issued to several financial institutions to identify cardholders for

transactions identified in the TSYS data. During this analysis, which represented

approximately $71,000 of the $150,000 processed by TSYS, $50,000 or 71% of

the funds collected were from patients who had received controlled substance

prescriptions from PATEL. Extrapolating this percentage to the full card

settlements received by ADVANCE results in approximately $183,000 from

patients who received controlled substance prescriptions.

63.     Bank records for PATEL were obtained from PNC Bank and Bank of America. These records showed that PATEL received approximately $387,000 from ADVANCE and made $60,000 in cash deposits from January 2017 to July 2022.

64.     Bank records for INDIVIDUAL-1 were received from Huntington National Bank and Frankenmuth Credit Union. These records showed INDIVIDUAL-1 received approximately $122,000 from ADVANCE from January 2017 to October 2022.

## CONCLUSION

65.     Based on the foregoing, I believe there is probable cause that SANGITA PATEL has conspired to commit health care fraud in violation of Title 18, United States Code, Section 1349

## REQUEST FOR SEALING

66.     I request that this Court issue an order sealing all papers submitted in support of this application, including the application, affidavit, and search warrant until: (a) the fact and particulars of the affidavit must be disclosed, pursuant to the government's legal obligations, to counsel for individuals who may be arrested in the future; or (b) the government represents that the items covered by this motion can be made public without substantial risk to the safety of defendant or others. I believe that sealing these documents in this fashion is necessary because the items

and information to be seized are relevant to an ongoing investigation of a criminal

conspiracy and not all of the targets of this investigation will be searched at this

time. Based upon my training and experience, I have learned that online criminals

actively search for criminal affidavits and search warrants via the Internet and

disseminate them to other online criminals as they deem appropriate, e.g., by

posting them publicly online through "carding" forums. Premature disclosure of

the contents of this affidavit and related documents may have a significant and

negative impact on the continuing investigation and may severely jeopardize its

effectiveness.

_____
Stephen T. Osterling
Special Agent
Federal Bureau of Investigation


Sworn to before me and signed in my presence and/or by reliable electronic means.

_____
Kimberly G. Altman
United States Magistrate Judge


Dated:  February 3, 2023